GRIFFIS, J.,
for the Court.
¶ 1. John F. Sellers was injured when he slipped and fell while working at Tin-dall Concrete Products, Inc. The Mississippi Workers’ Compensation Commission found that Sellers reached maximum medical improvement on May 19, 1998, and limited his permanent loss of wage-earning capacity to twenty-five percent. Sellers appealed to the Circuit Court of Harrison County, and the Commission’s decision was affirmed. Finding substantial evidence to support the Commission’s findings, we affirm.
FACTS
¶ 2. Sellers worked at Tindall as a production worker producing pre-stressed *1098 concrete products. Sellers described his job at Tindall as involving the pouring and spreading of cement into large molds on an outdoor production line to produce various pre-stressed concrete components used in the construction industry.
¶ 3. Sellers was injured on February 20, 1997, when he slipped on some diesel fuel on the ground and hurt his back. Sellers completed his shift that day, but sought medical treatment three days later from Dr. Cox, a chiropractor. Sellers did not work from February 23, 1997 until April 26, 1997, while he was under the care of Dr. Cox. On April 27, 1997, Sellers returned to work on restricted duty until June 7,1997.
¶4. In June of 1997, Sellers was still experiencing problems with his back, so Dr. Cox referred him to Dr. Howard Smith, a neurosurgeon. Dr. Smith treated Sellers with epidural steroid injections and prescribed a course of physical therapy. Dr. Smith testified that Sellers magnified his symptoms and did not give maximum effort in physical therapy. Dr. Smith also ordered diagnostic studies, including a CAT scan and an MRI, which revealed a herniated disc in Sellers’ lower back. However, Dr. Smith did not believe Sellers’ symptoms were consistent with a herniated disc and did not believe surgery would be beneficial.
¶ 5. When the injections and physical therapy failed to relieve Seller’s symptoms, Dr. Smith referred him to Dr. John Wyatt, a physiatrist. Dr. Wyatt recommended electromyography (EMG) and more physical therapy. Dr. Wyatt also noted that Sellers’ complaints did not match what he found in the medical records. Dr. Wyatt thought Sellers was exaggerating his symptoms.
¶ 6. Thereafter, Sellers attended an employer’s medical evaluation with Dr. Victor Bazzone, a neurosurgeon. Dr. Bazzone recommended surgery for Sellers’ herniated disc, which was performed on October 2, 1997. When Sellers returned to Dr. Smith after the surgery, Dr. Smith told him that he should continue to see Dr. Bazzone. Thereafter, Dr. Bazzone became Sellers’ primary treating physician.
¶ 7. Sellers continued to complain of low back pain after the operation. A follow-up MRI taken January 8, 1998, revealed residual scarring but no recurrent disc herniation. Dr. Bazzone opined that Sellers’ pain was caused by scar tissue swelling, and he prescribed steroid injections. At the next follow-up visit on January 28, 1998, Sellers told Dr. Bazzone that the steroids had not helped, but he also said that he felt ninety percent better than he had prior to the operation. Dr. Bazzone testified that ninety percent improvement is considered a success.
¶8. On March 11, 1998, Sellers again returned to Dr. Bazzone complaining of back pain. Dr. Bazzone recommended that Sellers get a second opinion. On March 16, 1998, Dr. Bazzone sent a letter to Liberty Mutual indicating that video camera surveillance should be undertaken on Sellers. Dr. Bazzone claimed that he was suspicious because Sellers was not progressing as rapidly as he thought he should, and that Sellers was possibly a malingerer. However, video surveillance was never undertaken.
¶ 9. After another follow-up visit on May 19, 1998, Dr. Bazzone found that Sellers had reached maximum medical improvement and assigned Sellers an impairment rating of eight percent to the body as a whole. Subsequently, the Commission appointed Dr. Howard Katz to perform an independent medical examination on Sellers. Dr. Katz agreed with Dr. Bazzone that Sellers had reached maximum medical improvement.
*1099 ¶ 10. Even after Dr. Bazzone determined that Sellers had reached maximum medical improvement, Sellers continued to complain of pain. Dr. Bazzone continued to treat Sellers for his pain symptoms, and eventually referred him to Dr. Paul Stanton, an orthopaedic surgeon. Dr. Stanton recommended a fusion to stabilize Sellers’ spine, but before this procedure could be performed, Dr. Stanton moved to California.
¶ 11. Dr. Stanton referred Sellers to Dr. Michael Lowry, a neurosurgeon. It was Dr. Lowry’s opinion that a fusion would not be beneficial because there was no evidence of instability in Sellers’ lumbar spine. Instead, Sellers claims that Dr. Lowry recommended a morphine pump. However, there is no evidence of such a recommendation in Dr. Lowry’s records, and he does not remember making such a recommendation. Dr. Lowry testified that, in his opinion, Sellers did not reach maximum medical improvement until May 10, 1999. However, he also testified that he would defer to Dr. Bazzone’s opinion since Dr. Bazzone was Sellers’ primary treating physician.
¶ 12. Sellers also sought treatment from Dr. Carrie Alexander and Dr. David McAfee regarding pain management after May 19, 1998, the assigned date of maximum medical improvement. Dr. Alexander, a family physician, prescribed medication including Valium, Neurontin and Oxycontin, and more physical therapy. Eventually, Dr. Alexander released Sellers from her care because she was no longer comfortable with his case. Her office notes indicated that she had concerns about the amount of Oxycontin that Sellers was taking.
¶ 13. Dr. McAfee, a specialist in pain management, saw Sellers on referral from Dr. Alexander to evaluate Sellers for advanced pain therapy, such as a morphine pump. Dr. McAfee testified that Sellers’ physical examination was inconsistent with the reported pain history, that Sellers was possibly exaggerating his symptoms, and that his symptoms were inconsistent with maneuvers that he performed during the examination. Dr. McAfee also questioned Sellers’ ability to control his narcotic medications.
¶ 14. On May 19, 1998, Sellers’ claim was heard before the administrative law judge for the Commission. The administrative law judge found that Sellers had reached maximum medical improvement, and limited Sellers’ permanent disability to a twenty-five percent loss of wage earning capacity. Sellers appealed to the Commission, where the administrative law judge’s order was affirmed. Sellers then appealed to the Circuit Court of Harrison County. The circuit court found substantial evidence in the record to support the Commission’s findings, and affirmed.
¶ 15. Sellers now appeals to this Court, asserting as error that (1) the administrative judge, the Commission and the circuit court erred in finding that Sellers had reached maximum medical improvement while failing to consider contrary medical testimony, and (2) that the administrative judge, the Commission and the circuit court erred in limiting Sellers’ permanent loss of wage earning capacity to twenty-five percent.
STANDARD OF REVIEW
¶ 16. An appellate court must defer to an administrative agency’s findings of fact if there is even a quantum of credible evidence which supports the agency’s decision. Hale v. Ruleville Health Care Center, 687 So.2d 1221, 1224 (Miss. 1997). “This highly deferential standard of review essentially means that this Court and the circuit courts will not overturn a Commission decision unless said decision *1100 was arbitrary and capricious.” Id. at 1225; Georgia Pacific Corp. v. Taplin, 586 So.2d 823, 826 (Miss.1991).
¶ 17. The supreme court has held:
We do not sit as triers of fact; that is . done by the Commission. When we review the facts on appeal, it is not with an eye toward determining how we would resolve the factual issues were we the triers of fact; rather, our function is to determine whether there is substantial credible evidence to support the factual determination by the Commission.
South Central Bell Telephone Co. v. Aden, 474 So.2d 584, 588 (Miss.1985). Stated differently, this Court will reverse the Commission’s order only if it finds that order clearly erroneous and contrary to the overwhelming weight of evidence. Myles v. Rockwell Int’l., 445 So.2d 528, 536 (Miss.1984) (citing Masonite Corp. v. Fields, 229 Miss. 524, 91 So.2d 282 (Miss. 1956)); Riverside of Marks v. Russell, 324 So.2d 759, 762 (Miss.1975). An appellate court may not simply reweigh the evidence and substitute its decision for that of the Commission. Indeed, this Court has a duty to defer to the Commission when its decision can be supported. Fought v. Stuart C. Irby, Co., 523 So.2d 314, 317 (Miss.1988).
ANALYSIS

I. Whether the administrative judge, the Commission and the circuit court erred in finding that Sellers had reached maximum medical improvement.

¶ 18. Sellers asserts the circuit court erred in its conclusion that the Commission’s determination of maximum medical improvement was supported by substantial evidence. We must consider the Commission as the ultimate fact finder. South Central Bell Telephone Co., 474 So.2d at 588. The Commission, therefore, enjoys the presumption that it made proper determinations as to the weight and credibility of the evidence and its factual findings are binding on this Court, and the circuit court as a reviewing court, provided the findings are supported by substantial evidence. Fought, 523 So.2d at 317.
¶ 19. Mississippi courts have held that “substantial evidence” means something more than a “mere scintilla” of evidence, and that it does not rise to the level of “a preponderance of the evidence.” Delta CMI v. Speck, 586 So.2d 768, 772-73 (Miss.1991). Thus, it may be said that substantial evidence “means such relevant evidence as reasonable minds might accept as adequate to support a conclusion.” Id. We look to determine whether there was substantial evidence to support the Commission’s determination.
¶ 20. Dr. Bazzone, Sellers’ primary treating physician, and Dr. Katz, who was appointed by the Commission to do an independent medical evaluation, both agreed that Sellers had reached maximum medical improvement on May 19, 1998. Sellers relies on Dr. Lowry’s determination that Sellers did not reach maximum medical improvement until May 10, 1999, and a statement by Dr. McAfee that Sellers has not reached maximum medical improvement from a pain management standpoint.
¶ 21. However, Dr. Lowry testified that while he felt Sellers did not reach maximum medical improvement until May 10, 1999, he would defer to Dr. Bazzone, as Sellers’ primary treating physician. As for Dr. McAfee, he did testify that Sellers may not have reached maximum medical improvement from a pain management standpoint, but he also testified that Sellers’ physical examination was inconsistent with the reported pain history, and that *1101 Sellers was possibly exaggerating his symptoms. Furthermore, Dr. Bazzone testified that management of pain has nothing to do with whether or not a patient has reached maximum medical improvement.
¶ 22. Sellers also argues that the Commission erred in determining he had reached maximum medical improvement because he continued to have problems and seek treatment well after the set date for maximum medical improvement. However, all of the physicians Sellers sought treatment from after May 19, 1998, dealt with pain management, and as Dr. Baz-zone testified, pain management has nothing to do with maximum medical improvement. Furthermore, the physicians from whom Sellers sought treatment questioned whether Sellers was exaggerating his pain symptoms.
¶ 28. Based on the testimony from Sellers’ physicians, the Commission had substantial evidence to support its finding that Sellers reached maximum medical improvement on May 19, 1998. Therefore, we find that the circuit court did not err in affirming the Commission.

II. Whether the administrative judge, the Commission and the circuit court erred in limiting Sellers’ permanent loss of wage earning capacity to twenty-five percent.

¶24. Sellers asserts that it was error to limit his loss of wage earning capacity to twenty-five percent. Sellers argues that since he is unable to return to his previous employment and has had difficulty in obtaining new employment due to his medical condition, he should be awarded permanent total disability.
¶ 25. There is well-established law that a claimant in a workers’ compensation claim bears the burden of establishing a loss of wage-earning capacity. Robinson v. Packard Electric Division, 523 So.2d 329, 331 (Miss.1988). The issue of loss of wage-earning capacity:
in the final analysis ... is largely factual and is to be left largely to the discretion and estimate of the Commission. Often the estimate of loss of wage-earning capacity involves a compromise of medical estimates, and the result is generally sustainable in appeal to the courts. The loss is to be determined in each case from the evidence as a whole.
Vardaman S. Dunn, Mississippi Workers’ Compensation Law and Practice Rules and Forms, § 68 (3d ed. 1982 & Supp. 1990).
¶ 26. While Sellers testified that he could not do the job he did before he was injured, the record indicates that he possesses skills in the computer field that would allow him to obtain employment within his physical limitations. In fact, Sellers testified that he has widely varied experience, training, and work history, and that his friends nicknamed him “Bill Gates.” Sellers has been repairing computers to earn money since shortly after he was injured.
¶ 27. The Commission also noted that Sellers refused to cooperate in functional capacity evaluations and made questionable efforts to obtain employment. Sellers applied for various positions for which he had no relevant experience or for which he did not meet the educational requirements. Also, when questioned, Sellers admitted that he did most of his job hunting over the Internet and had sent out only a few resumes or written job applications. Furthermore, no physician ever placed restrictions on Sellers’ activity or found him to be permanently and totally disabled.
¶ 28. Therefore, based on the evidence as a whole, we find that there was substantial evidence to support the Commission’s *1102 determination to limit Sellers’ loss of wage earning capacity to twenty-five percent. Accordingly, we affirm the circuit court on this issue.
¶ 29. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., BRIDGES AND SOUTHWICK, P.JJ., LEE, IRVING, MYERS AND CHANDLER, JJ„ CONCUR.